UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| LEWBAR IMPORTS, INC., ) <br><br> *Plaintiff,* ) <br><br> v. ) <br><br> MERCEDES-BENZ, USA, LLC, ) <br><br> *Defendant.* ) | CIVIL ACTION NO. 3:07-CV-30182 |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Lewbar Imports, Inc. ("Lewbar") seeks damages under a host of statutory and common law theories allegedly caused when defendant Mercedes-Benz, USA, LLC ("MBUSA") terminated Lewbar's motor vehicle dealership contracts. Lewbar has admitted, however, to the material breaches of the Dealer Agreements that gave rise to Lewbar's proper termination of the dealership under the plain language of both the Dealer Agreements and the relevant Massachusetts statutes. Lewbar has no legal claim for damages against MBUSA resulting from its failure to sell its dealership in the weeks prior to the effective date of MBUSA's lawful and proper termination of those Dealer Agreements, after timely notices of termination already had been issued. Nothing about MBUSA's conduct in September 2007 preceding the effective date of termination was unlawful or improper in any way. MBUSA is entitled to summary judgment because there is no legal basis to conclude that MBUSA's lawful termination constituted a breach of the Dealer Agreements, violated M.G.L. c. 93B, §§ 4 or 15, or was wrongful under

common law.  Accordingly, MBUSA's motion should be granted and judgment entered in its

favor on all five counts of the Amended Complaint.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

Lewbar was an authorized Mercedes-Benz dealer in West Springfield, Massachusetts

pursuant to a separate Passenger Car Dealer Agreement and a Light Truck Dealer Agreement

(together, "Dealer Agreements").[1]  (Statement of Undisputed Material Facts ¶ 1; Declaration of

Erica Tennyson ("Tennyson Dec."), filed herewith, at <u>Exhibits B & C</u>, Dealer Agreements.)[2]

Pursuant to these Dealer Agreements, which were for all intents and purposes identical contracts,

Lewbar was authorized to sell and service Mercedes-Benz vehicles.  (<u>Id.</u>)

### A.  Lewbar's Deficiencies and MBUSA's Efforts to Work With Lewbar to Improve Its Performance

Lewbar started having financial difficulties in 2003.  (Statement of Undisputed Material

Facts ¶ 3.)  Toward the end of 2006, the MBUSA market team began monitoring Lewbar's

dealership even more closely and working with it to develop an improvement plan.  (<u>Id.</u> at ¶ 4.)

MBUSA renewed its Dealer Agreements with Lewbar on January 1, 2007, for just one year

rather than the usual multiple-year renewal period because of its concerns about the dealership's

sales performance and the fact that its building, showroom and other facilities were inadequate to

meet MBUSA's dealership standards.  (<u>Id.</u> at ¶ 5.)  Lewbar agreed to provide MBUSA with a

written plan to correct all facility deficiencies no later than June 30, 2007, to staff a number of

---

[1] Lewbar's two principals, Susan Pollack and her sister Beth Veltri, acquired its stock in 1997 when they
bought the dealership from their father.  (Statement of Undisputed Material Facts ¶ 1.)  Pollack is the
president of Lewbar and was responsible for the dealership's day-to-day operations. (<u>Id.</u>)  Veltri did not
play any role in the company's operations.  (<u>Id.</u>)

[2] Hereinafter, references to "Exhibits __" shall mean exhibits attached to the Tennyson Declaration.

vacant management and sales associate positions, and to provide a plan for capital infusion to address the dealership's negative net worth of $1,045,645 as of December 31, 2006.  (Id.)

For the first half of 2007, the MBUSA market team continued to work closely with Lewbar in an effort to improve the dealership's performance and financial condition.  (Id. at ¶ 6.) Nonetheless, the dealership did not make sufficient improvements.  (Id.)  Pollack claims that, instead, she orally told MBUSA representatives by June 30, 2007 that Lewbar's general plan was to find new partners to inject money into the dealership – but she concedes that she did not identify those potential new partners to MBUSA.  (Id. at ¶ 7.)

As of mid-July 2007, Lewbar was still performing poorly.  (Id. at ¶ 8.)  Pollack also admits that, while she invested approximately $150,000 into the dealership in 2007, that did not fully address Lewbar's negative net worth of over a million dollars, as reported on the December 2006 financial statements.  (Id. at ¶ 9.)  Lewbar's 2007 sales performance in terms of number of vehicles sold was lower than its 2006 levels.  (Id. at ¶ 10.)  The May 2007 financial statement reflected a negative net worth of $761,674, including significant liability for past taxes.  (Id. at ¶ 11.)  Pollack admits that Lewbar's financial position continued to deteriorate between May and August 27, 2007.  (Id.)

**B.  MBUSA's Curable Notice of Termination on July 31, 2007**

On July 31, 2007, MBUSA sent Lewbar a notice of termination stating that the Dealer Agreements would terminate in 60 days pursuant to Section XI.B.2 of the Dealer Agreements, unless Lewbar remedied two material breaches.  (Id. at ¶ 13; Exhibit D, 7/31/07 Notice of Termination.)  Pollack was not surprised to receive this termination notice because "it was becoming very difficult to conduct business, period" and "[f]inancially we were having a tough time." (Statement of Undisputed Material Facts ¶ 14.)  She admitted that it was reasonable for

-3-

MBUSA to have concerns about the future viability of the dealership; Pollack shared those concerns.  (Id.)  Lewbar did not submit any monthly financial statements to MBUSA after its late May 2007 statement.  (Id. at ¶ 12.)

Pollack tried to find a new partner or investor for Lewbar as its financial position continued to deteriorate.  (Id. at ¶ 15.)  During the weeks following the July 31, 2007 termination notice, MBUSA encouraged these efforts.  (Id.)  In mid-August, Pollack told Piekarski that she had a new partner lined up, but she would not disclose who it was.  (Id.)  Piekarski and Kurp regularly attempted to contact Pollack in August; she routinely failed to return their telephone calls and e-mails.  (Id. at ¶ 16.)  Lewbar did not find an investor or partner to infuse capital into the dealership by the end of August.  (Id. at ¶ 17.)

### C.  Lewbar Voluntarily Closed the Dealership on August 27, 2007

Lewbar voluntarily closed its business operations on August 27, 2007 and never reopened for business.  (Id. at ¶ 18.)  Pollack testified in deposition that she closed the dealership because of its poor financial condition, including its inability to pay its employees and other operating expenses and the fact that its liabilities exceeded the value of its assets.  (Id. at ¶ 19.)  As of August 27, Lewbar did not have adequate floor plan lines.  (Id.)

Lewbar laid off its employees on August 27, 2007.  (Id. at ¶ 20.)  The dealership was unable to make payroll the preceding Friday.  (Id.)  Lewbar turned away customers in person and on the phone.  (Id. at ¶ 21)  Customers were told that their cars could not be serviced and alternate service arrangements had to be made for cars that were in the process of being serviced at that time.  (Id.)  Several customers complained as a result.  (Id.)

**D.  MBUSA's Notice of Termination on August 28, 2007 With No Right to Cure**

The next day, in response to Lewbar's sudden closing, MBUSA issued a second notice of termination pursuant to the terms of the Dealer Agreements and M.G.L. c. 93B, § 5(d)(3) on the grounds that Lewbar had ceased operations as an authorized Mercedes-Benz dealer and was insolvent.  (Id. at ¶ 22; Exhibit E, 8/28/07 Notice of Termination.)  This second termination included a statutory 15-day notice period with no right to cure.  (Id.)  Lewbar concedes that, as of August 28, 2007, it had ceased operations, was insolvent and was unable to pay its bills as they became due.  (Statement of Undisputed Material Facts at ¶ 23.)  The termination became effective by the terms of the second notice on September 13, 2007.  (Id. at ¶ 24.)

**E.  Lewbar's Efforts to Sell its Dealership After the August 28, 2007 Incurable Notice of Termination Was Issued**

After MBUSA issued the August 28 notice of termination, Lewbar continued to solicit offers to sell the dealership.  Pollack continued to refuse to reveal the prospective purchasers to MBUSA.  (Id. at ¶ 25.)  Sometime after MBUSA issued the second notice of termination on August 28, Lewbar was approached by a third party, Gengras Motor Group, ("Gengras") about purchasing the dealership.  (Id. at ¶ 26.)  On September 12, 2007, Lewbar's counsel forwarded Karl Stephan a Letter of Intent indicating Gengras's interest in buying Lewbar's dealership.  (Id. at ¶ 27; Am. Compl. Ex. B, 9/12/07 Letter of Intent between Lewbar and Gengras.)  Importantly, the Letter of Intent included nine contingencies that "must be fulfilled" before Gengras was obliged to purchase. (Statement of Undisputed Material Facts at ¶ 27.)  One of the contingencies was that Gengras's review of Lewbar's assets, contractual commitments, obligations, books and records "shall be satisfactory to BUYER [Gengras] in its sole discretion."  (Id.)  Pollack does not know if the contingencies were all satisfied.  (Id. at ¶ 28.)

-5-

On September 13, 2007, in response to receiving a copy of the Letter of Intent, MBUSA sent Lewbar's counsel a letter explicitly stating that the Letter of Intent did not "stay" the July 31 and August 28 terminations.  (Id. at ¶ 29; Exhibit F, 9/13/07 Letter from M. Kelly to J. Martin.) Nonetheless, MBUSA indicated that it was willing to toll the effective date of the termination for just one week until September 20, 2009 as an "accommodation to Lewbar" so as "to permit all parties involved the opportunity to review Lewbar's intentions with respect to commencing business operations at the dealership and the proposed sale of the assets of the dealership."  (Id.) The extension was conditioned on Lewbar submitting a written business plan and management agreements by September 17, 2007.  (Id.)  If Lewbar agreed to these terms, it was directed to acknowledge its acceptance in writing by signing the letter and returning it to Karl Stephan.  (Id.) Lewbar never accepted the terms of the extension or returned the signed acknowledgement. (Statement of Undisputed Material Facts at ¶ 30.)

### F.  MBUSA's Notice of Termination on September 17, 2007 With No Right to Cure

By letter dated September 17, 2007, MBUSA notified Lewbar that the Dealer Agreements "shall" be terminated effective 15 days after receipt of the letter pursuant to M.G.L. c. 93B, § 5(d)(1) because Lewbar had ceased operations as a Mercedes-Benz dealer and its dealership facilities had been closed for more than seven consecutive business days.  (Id. at ¶ 31; Am. Compl. Ex. A, 9/17/07 Notice of Termination.) [3]  Like the August 28, 2007 notice of termination, this third notice provided no right to cure.  (Id.)  When the statutory notice period

---

[3] It is MBUSA's position that the Dealership Agreements were terminated effective September 13, 2007 pursuant to the terms of the August 28 second notice.  (See Exhibits E & G.)  Nonetheless, in an abundance of precaution, MBUSA sent a third notice of termination citing the fact that Lewbar had been closed for more than seven consecutive business days as an additional ground for termination under the Dealer Agreements and M.G.L. c. 93B, § 5.  (Am. Compl. Ex. A.)  This third notice of termination explicitly reserved MBUSA's rights under the previous notices of termination.  (Statement of Undisputed Material Facts ¶ 32; Am. Compl. at Ex. A.)

expired 15 days later on October 2, 2007, the Dealer Agreements terminated under the terms of the third notice.  (Id. at ¶¶ 31, 33; Am. Compl. Ex. A.)

By letter dated September 20, 2007, MBUSA explicitly confirmed to Lewbar that the termination of the Dealer Agreements noticed in its August 28, 2007 letter had become effective. (Statement of Undisputed Material Facts at ¶ 34; Am. Compl. Ex. C, 9/20/07 Letter from T. Matura to S. Pollack.)[4]  Lewbar's counsel continued to contact MBUSA representatives, including a request on September 24, 2007 to confer pursuant to M.G.L. c. 93B, § 15(b) about "possible settlement of the proposed termination" of the dealership.  (Statement of Undisputed Material Facts at ¶ 35; Verified Compl., Ex. D.)  In response, MBUSA reiterated that the dealership had been terminated effective September 13, 2007 and that MBUSA had no continuing obligations to Lewbar.  (Statement of Undisputed Material Facts at ¶ 36; Exhibit G, 9/27/07 Letter from M. Kelly to J. Martin.)

## PROCEDURAL HISTORY

Lewbar filed its Verified Complaint under M.G.L. c. 93B, § 5 on September 26, 2007 [Docket No. 1] and an Emergency Motion for Preliminary Injunction on September 27, 2007 [Docket Nos. 2-3].  After hearing, the Court denied preliminary injunction on October 1, 2007. On February 20, 2008, Lewbar filed an Amended Complaint, in which it removed its allegations under M.G.L. c. 93B, § 5 and instead added claims under M.G.L. c. 93B, §§ 4 and 15, and for breach of contract, promissory estoppel and negligent misrepresentation.  [Docket No. 17.]

On September 5, 2008, after Lewbar repeatedly failed to respond to discovery requests or to produce a representative for deposition, MBUSA moved to dismiss the case pursuant to Rule

---

[4] MBUSA's September 20, 2007 letter was explicitly sent without prejudice to MBUSA's rights as set forth in prior letters, including the September 17 third notice of termination. (Statement of Undisputed Material Facts ¶ 34; Am. Compl. at Ex. C.)

41 for failure to prosecute.  [Docket Nos. 19-21.]  After hearing on September 29, 2008, the

Court denied MBUSA's motion to dismiss the Amended Complaint, but ordered Lewbar to

respond to MBUSA's outstanding document requests and to present itself for deposition by

October 27, 2008.  At a case management conference in November 2007, the Court allowed

Lewbar's oral request to depose MBUSA on limited topics prior to December 31, 2008.

MBUSA has twice made two witnesses available for deposition, but Lewbar has chosen not to

conduct the depositions.[5]

## ARGUMENT

### A.  Summary Judgment Standard

Summary judgment purports "to pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial."  Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto

Rico, Inc., 332 F.3d 6, 12 (1st Cir. 2003) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st

Cir. 1990) (quoting Fed. R. Civ. P. 56 Advisory Committee's note)).  In deciding whether a

factual dispute is "genuine," the Court must determine whether the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477

U.S. 242, 248 (1986).  Further, a genuine issue of material fact cannot merely rest upon "spongy

rhetoric" but rather requires substantive proof.  Mulvihill, 335 F.3d at 19 (citing Mesnick v. Gen.

Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992) ("[g]enuine issues

of material fact are not the stuff of an opposing party's dreams")).

The party objecting to summary judgment may not merely rest upon the statements in its

own pleadings.  See Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st Cir. 2002)

---

[5] Lewbar's counsel explained that Lewbar did not have the financial wherewithal to take the depositions.
And, on January 14, 2009, Pollack filed an individual Chapter 7 bankruptcy petition in the United States
Bankruptcy Court for the District of Connecticut.  Lewbar has not filed for bankruptcy protection.

(citing <u>Colantuoni v. Alfred Calcagni & Sons, Inc.</u>, 44 F.3d 1, 4-5 (1st Cir. 1994)). Instead, Rule 56(c) "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Because Lewbar "cannot muster sufficient evidence to make out its claim, a trial would be useless" in this case and MBUSA is entitled to summary judgment on all counts as a matter of law. <u>See id.</u> at 331 (citing <u>Anderson</u>, 477 U.S. at 249).

### B. As Lewbar Has Conceded, MBUSA's Termination of the Dealer Agreements Was Valid and Lawful Under the Plain Language of Both the Dealer Agreements and M.G.L. 93B, § 5.

The Dealer Agreements between Lewbar and MBUSA set forth numerous categories of dealer conduct that are grounds for "immediate termination" of the Dealer Agreements. (<u>Exhibits B & C</u>, Dealer Agreements at § XI.B.1.) The relevant contractual provision states:

> Dealer and MBUSA agree that the following conduct is within Dealer's control and is <u>so contrary to the goals, purposes and objectives of this Agreement as to warrant its immediate termination</u>. Accordingly, Dealer agrees that if it engages in any of the following types of conduct, <u>MBUSA shall have the right to terminate this Agreement immediately</u>: …

> d.       The failure of Dealer to conduct all Dealership Operations required by this Agreement during and for not less than the customary and lawful hours for five (5) consecutive business days, except in the event such closure or cessation of operation is caused by some physical event beyond the control of the Dealer, such as strikes, civil war, riots, fires, floods, earthquakes, or other acts of God; …

> f.       Insolvency of Dealer….

<u>Id.</u> at § XI.B.1(d) & (f) (emphasis added). The Massachusetts statute governing termination of motor vehicle dealerships similarly provides that MBUSA could lawfully terminate the Dealer Agreements with 15 days notice to Lewbar if either "a motor vehicle dealer's facilities have been

-9-

abandoned or closed for more than 7 consecutive business days" or the dealer becomes insolvent. M.G.L. c. 93B, § 5(d)(1) & (3).  In the August 28 and September 17, 2007 notices of termination, MBUSA terminated the Dealer Agreements in compliance with each of these contractual and statutory grounds.  (Exhibit E; Am. Compl. Ex. A.)

In fact, Lewbar does not dispute the factual bases of MBUSA's termination of the Dealer Agreements.  (See Pollack Dep. at 19.)  Pollack admits that the dealership facilities closed on August 27, 2007 and never reopened.  (Id. at 18, 117.)  She concedes that Lewbar was insolvent at the time the dealership closed its operations.  (Id. at 9-10, 66-69; Am. Compl. ¶ 15.)  Pollack shared MBUSA's concerns about the dealership's financial condition; that was the reason she wanted to sell the business.  (Pollack Dep. at 9-10, 98.)  There is no dispute that MBUSA had grounds under Section XI.B.1(d) & (f) of Dealer Agreements and M.G.L. c. 93B, § 5(d) to terminate the dealership agreements.

Moreover, Lewbar does not even claim that the actual terminations were improper.[6] While MBUSA's position is that the Dealer Agreements were terminated when the second notice of termination became effective on September 13, 2007, the parties do not dispute that the Dealer Agreements were properly terminated at least by October 2, 2007.  (Am. Compl. ¶¶ 14 & 20.)

## C. Lewbar Cannot Meet Its Burden of Proving That MBUSA Violated M.G.L. c. 93B, § 4 (Count I)

Chapter 93B, the so-called "Dealer's Bill of Rights," "addresses unfair methods of competition in the automobile industry and protects dealers from coercive manufacturing practices."  Gallo Motor Center Corp. v. Mazda Motor of America, Inc., 190 F. Supp. 2d 188, 190 (D. Mass. 2002); Beard Motors, Inc. v. Toyota Motor Distrib., Inc., 395 Mass. 428, 480

---

[6] In fact, the Verified Complaint that was first filed in this action alleged a violation of M.G.L. c. 93B, § 5, which governs the proper renewal, termination or transfer of franchises.  [Docket No. 1.]  That claim was dropped when Lewbar filed its Amended Complaint.  [See Docket No. 17.]

N.E.2d 303 (1985).  Section 4 enumerates a number of acts that constitute unfair competition or

deceptive practice by a motor vehicle manufacturer, distributor, franchisor representative or

dealer, but the provision clearly protects commercially reasonable actions of a manufacturer or

distributor that are made for good cause and are not "arbitrary, in bad faith, or unconscionable."

See M.G.L. c. 93B, § 4(a).  Although Chapter 93B seeks to protect automobile dealers from an

inequitable power balance, "it does not purport to shield them entirely from adverse decisions

formulated on legitimate business and economic grounds."  Foreign Motors, Inc. v. Audi of

America, Inc., 755 F. Supp. 30, 35 (D. Mass 1991); Bertera Chrysler Plymouth, Inc. v. Chrysler

Corp., 992 F. Supp. 64, 69-71 (D. Mass 1998) (claim for violation of  M.G.L. c. 93B, § 4

dismissed on summary judgment where there was no evidence in the record that the national

franchiser acted arbitrarily, in bad faith or unconscionably); General GMC, Inc. v. Volvo White

Truck Corp., 1987 U.S. Dist. LEXIS 11817, at *8-9, 11 (D. Mass., Nov. 19, 1987) ("Clearly,

legitimate business reasons satisfy the requirement of good cause" to terminate a franchise

agreement).  In light of Lewbar's insolvency and MBUSA's concerns about its sudden closing of

dealership operations (Exhibit G, 9/27/07 Letter from M. Kelly to J. Martin; Piekarski Aff. ¶¶ 8,

14 & Ex. 5; see Pollack Dep. at 136), there can be no dispute that MBUSA's termination of the

Dealer Agreements and refusal to rescind that termination were legitimate business decisions and

not "arbitrary, in bad faith, or unconscionable."  See M.G.L. c. 93B, § 4(a).

> **a.  Because Lewbar claims that MBUSA violated M.G.L. c. 93B, § 4 after Lewbar had committed incurable breaches and termination of the Dealer Agreements was noticed, Lewbar's claim for violation of Section 4 fails as a matter of law.**

Despite conceding that MBUSA had good cause to terminate the Dealer Agreements,

Lewbar claims that, pursuant to M.G.L. c. 93B, § 4, its submission of Gengras's Letter of Intent

to MBUSA "required the Defendant to allow the Plaintiff to have an opportunity to sell its assets

and required the Defendant to review and make a determination as to whether Gengras is a

qualified candidate as a replacement dealer." (Am. Compl. ¶ 22.) In making this claim, Lewbar

ignores the fundamental fact that the two grounds for termination that MBUSA cited in its

August 28 and September 17 termination notices are <u>material</u> breaches of the Dealer Agreements

that "warrant [their] <u>immediate termination</u>." (<u>Exhibits B & C</u>, Dealer Agreements at § XI.B.1

(emphasis added).) Once each breach occurred, Lewbar did not have a right to cure the default.

<u>Id.</u> ("Dealer agrees that if it engages in any of the following types of conduct, MBUSA shall

have the right to terminate this Agreement immediately."); M.G.L. c. 93B, § 5(d) ("only 15 days

notice before an effective termination date shall be required" for violations of Section 5(d)). The

terminations became effective solely upon the passage of the 15-day notice period required in the

statute. M.G.L. c. 93B, § 5(d); <u>compare</u> M.G.L. c. 93B, § 5(b) & (c).[7]

    In <u>Anna Cara Oil Co. v. Shell Oil Co.</u>, 32 B.R. 643 (B.R. D. Mass. 1983), a petroleum

franchisor sent a proper notice of termination to its franchisee on January 12, 1982, establishing

the effective date of termination as April 15, 1983. <u>Id.</u> at 645. On April 14, 1983, the day before

the notice period expired, the franchisee filed a Chapter 11 petition for bankruptcy. <u>Id.</u> at 646.

The bankruptcy court found that even the automatic stay in bankruptcy cases afforded by 11

U.S.C. § 362 did not stay the termination of the franchise relationship on April 15, 1983 by the

terms of the January 12, 1982 notice letter. <u>Id.</u> at 646. The same is true in this case. Because

"the defaults in the franchise relationship are incurable," <u>id.</u> at 646, and because Lewbar can

point to no legal authority in support of its claim that the Letter of Intent stayed the dealership's

---

[7] Because Lewbar never remedied the material breaches set forth in the first notice of termination from July 31, 2007, the Dealer Agreements also terminated 60 days later on September 29, 2007 pursuant to the first notice and M.G.L. c. 93B, § 5(b). (<u>See</u> <u>Exhibit D</u>, 7/31/07 Notice of Termination.)

51426838.7

termination, the Dealer Agreements terminated on September 13, 2007 by the terms of MBUSA's August 28, 2007 notice of termination.

Lewbar implores this court to ignore the valid legal and contractual grounds for termination and allow it to seek damages for its failure to sell its assets to Gengras or another potential suitor. This argument fails, however, because once the Dealer Agreements were terminated based on proper grounds for immediate termination and with proper notice, there was nothing Lewbar could do to revive the dealership during the 15-day notice period in order to sell it. See M.G.L. c. 93B, § 5(d). The only way for Lewbar to forestall an otherwise valid termination would have been to obtain a stay of termination. See M.G.L. c. 93B, § 5(f); see Foreign Motors, Inc. v. Audi of America, Inc., 755 F. Supp. 30, 33 (D. Mass. 1991) ("a stay of termination is essentially identical to a preliminary injunction, and, as such, a plaintiff must meet the well-established criteria governing entitlement to such relief.") It did not do so. Instead, Lewbar brought an emergency motion for preliminary injunction in this matter on September 27, 2007, which this Court denied. [Docket Nos. 2-3]. Because MBUSA had no legal obligation to undo the termination caused by Lewbar's incurable defaults, it is entitled to summary judgment on Lewbar's Section 4 claim.

### b. MBUSA's alleged refusal to consider Gengras as a potential applicant is not actionable because that consideration would have been futile.

Lewbar also alleges that MBUSA breached M.G.L. c. 93B, § 4 by failing promptly to mail a dealership application to Gengras. (Am. Compl. ¶¶ 19, 23.) Although the statute requires a manufacturer or distributor to "promptly mail a dealership application to a proposed assignee, delegee or transferee following any request therefor," M.G.L. c. 93B, § 4(c)(8), Massachusetts law does not require parties to perform futile acts. Kurker v. Shoestring Props. L.P., 68 Mass. App. Ct. 644, 656 (2007) ("pursuit of futile matters is not favored in our law, and we have found

-13-

no authority to the contrary.").  MBUSA received Gengras's Letter of Intent on September 12,

2007, the day before the termination of the Dealer Agreements became effective.  At most,

Gengras would have been purchasing the right to operate the dealership in its last day of

operation.  No court has interpreted the statute to require a manufacturer to mail a dealership

application to a proposed assignee when the Dealer Agreements had already been lawfully

terminated for an incurable breach, with the only thing remaining before the effective date of

termination being the mere passage of time.  Such an interpretation is not reasonable.

### D.  Because Lewbar Cannot Prove That MBUSA Violated Any Provision of M.G.L. c. 93B, It Cannot Recover Damages Under M.G.L. c. 93B, § 15 (Count II)

Lewbar alleges a claim for damages for MBUSA's alleged violation of M.G.L. c. 93B,

§ 15.  (Am. Compl. ¶ 24-26.)  Section 15(a), however, does not enumerate an independent cause

of action.  It only provides for recovery of damages when a dealer "suffers any loss of money or

property, real or personal, as a result of the use or employment by a manufacturer of an unfair

method of competition or an unfair or deceptive act or practice" as set forth in Section 4 and the

other provisions of Chapter 93B.  Id. at § 15(a).  If Lewbar cannot prove that MBUSA violated

another provision of Chapter 93B, it cannot recover under Section 15.  Id. at § 15(a) & (c).

Lewbar separately alleges that MBUSA "ignored the Plaintiff's efforts to confer as

required by this statute."  (Am. Compl. ¶¶ 13, 26.)  MBUSA contends that, because the

dealership was terminated effective September 13, 2007, and because that fact was made

explicitly clear to Lewbar at least by September 20, MBUSA had no continuing obligation to

confer with Lewbar when it requested a conference on September 24.  (Exhibit G, 9/27/07 Letter

from M. Kelly to J. Martin; see Exhibit E & Am. Compl. Ex. C.)  Even if MBUSA's refusal to

confer at that juncture was somehow improper under the statute, however, Lewbar still does not

have a statutory cause of action.  See M.G.L. c. 93B, § 15(b).  The sole remedy provided for a

-14-

failure to confer in violation of Section 15(b) is that the alleged failure may be "evidence… of bad faith" during court proceedings brought under Chapter 93B.  Id.  As a result, if the Court grants judgment for MBUSA on Lewbar's claim under Section 4 for the reasons discussed in Part C, it must likewise grant judgment for MBUSA under Section 15.

**E.  Lewbar Cannot Meet Its Burden of Proving That MBUSA Breached The Dealer Agreements (Count III)**

As an initial matter, the Court's construction of the Dealer Agreements is governed by the choice-of-law provision in Section XIV.H, which designates New Jersey as the choice-of-law.  Clair Int'l, Inc. v. Mercedes-Benz of N. Am., Inc., 124 F.3d 314, 320 (1st Cir. 1997) (enforcing parties' choice of New Jersey law in the dealership agreement); Bertera, 992 F. Supp. 64, 69-71 (D. Mass 1998) (enforcing Michigan choice-of-law designation).

Lewbar does not identify which contractual provisions, if any, of the Dealer Agreements it claims MBUSA has breached.  (See Am. Compl. ¶¶ 22-23.)  The breach of contract claim simply states that MBUSA "was bound by the terms of the Dealer Agreements by and between the Plaintiff and the Defendant" and the "Defendant's breach of contract has damaged the Plaintiff."  (Id.)  As set forth above, Lewbar has conceded that the termination of the Dealer Agreements was in compliance with the agreements. There is no evidence that MBUSA committed any breach of any other contractual obligation under the Dealer Agreements. Lewbar's sole factual allegations are that MBUSA failed to approve Lewbar's proposed sale of its assets to Gengras and failed promptly to mail a dealership application to Gengras, and thus its consent to the sale was unreasonably withheld.  (Id. at ¶¶ 18-19.)  A plain reading of the Dealer Agreements, however, clearly establishes that they do not govern any activity about which Lewbar complains.  See, e.g., Wright v. Prudential Ins. Co. of Am., 285 F.Supp.2d 515, 523,24 (D.N.J. 2003) ("it is difficult to understand how Prudential's conduct as described by Plaintiffs

-15-

could fulfill the elements of any breach of contract claim" since Prudential's conduct was consistent with the express terms and conditions of the parties' agreement).

More importantly, the Dealer Agreements were already terminated in accordance with the contractual termination provisions by the time Lewbar sent Gengras's Letter of Intent to MBUSA on September 12, 2007, subject only to the expiration of the 15-day notice period.  See Motorsport Eng'g Inc. v. Maserati, S.p.A., 183 F. Supp. 2d 209, 224 (D. Mass. 2001) (summary judgment would be granted on a breach of contract claim where the contract had already terminated by its own terms).  Because Lewbar cannot prove that MBUSA breached the terms of the Dealer Agreements, judgment should enter for MBUSA on the breach of contract claim.

**F. Lewbar Cannot Meet Its Burden of Proving Its Common Law Claim for Promissory Estoppel (Count V)[8]**

To prove a claim of promissory estoppel under Massachusetts law, Lewbar must prove that (1) that MBUSA made a representation which it should reasonably expect to induce action or forbearance of a definite and substantial character on Lewbar's part, and (2) that Lewbar acted in reasonable reliance of that representation (3) to its detriment.  Carroll v. Xerox Corp., 294 F.3d 231, 242 (1st Cir. 2002) (quoting Loranger Const. Corp. v. E. F. Hauserman Co., 6 Mass. App. Ct. 152, 374 N.E.2d 306, 308 (Mass. App. Ct. 1978)).  In Massachusetts, promissory estoppel is a contract without consideration.  Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004) (citing Loranger, 384 N.E.2d at 179).  If a party detrimentally relies on another's promise, the promise may be enforceable as a contract.  Loranger, 376 Mass. at 760–61, 384 N.E.2d at 179–80.

---

[8] Lewbar's Amended Complaint sets forth a total of five claims, the last two of which are misnumbered. They are: violation of M.G.L. c. 93B, § 4 (Count I), violation of M.G.L. c. 93B, § 15 (Count II), breach of contract (Count III), promissory estoppel (Count V) and negligent misrepresentation (Count VI).

Despite the allegation that MBUSA made an "unambiguous promise" to allow Lewbar "the opportunity to complete the sale of its assets to a third party," Pollack admitted in her deposition that no one at MBUSA ever represented to her, either orally or in writing, that she could pursue efforts to sell Lewbar's business to Gengras and, if that deal were successful, the termination notices would be withdrawn.  (Pollack Dep. at 150-51.)  She claims that any such promises were made to her lawyer after the business ceased operations on August 27, 2007 (id. at 152-154; compare Am. Compl. ¶¶ 31-32), but there is no admissible evidence of these alleged promises.  In the absence of any evidence any "unambiguous promise" to do anything, Count V must fail.

Even accepting as true, *arguendo*, that MBUSA made such a representation to Lewbar's counsel, and that as a result it continued to negotiate with Gengras in good faith, Lewbar will not be able to meet its burden of proof on the latter two elements of the cause of action.  First, Lewbar cannot prove that it suffered any pecuniary loss or other detriment as a direct result of the act of reliance it alleges MBUSA induced, which is that it "continued to negotiate with the third-party in good faith."  (Am. Compl. ¶ 32.)  Rather, the detriment it claims – the fact that it was deprived of the "ability to complete the transaction" and therefore suffered damages – could not possibly result from any breach of any alleged promise made by MBUSA.  (Id. at ¶ 33.) Lewbar's inability to sell its assets was the direct result of MBUSA's lawful termination of the Dealer Agreements due to Lewbar's material breaches of those agreements and the provisions of M.G.L. c. 93B, § 5, not its continued negotiations with Gengras after the dealership closed on August 27, 2007.  MBUSA's alleged promise to allow Lewbar the opportunity to sell its assets

could not possibly have deprived Lewbar the ability to complete that transaction, as alleged.  (Id. at.. ¶¶ 31-33.)[9]

Second, any alleged reliance by Lewbar on MBUSA's representations that it would be allowed to complete the sale of its assets was not reasonable as a matter of law.  At the time of MBUSA's alleged "unambiguous promise to allow the Plaintiff the opportunity to complete the sale" (id. at ¶ 31), Lewbar had already received a notice that the dealership had been terminated and that the termination would be effective in 15 days.  (See Exhibit E, 7/28/07 Notice of Termination.)  Because no one at MBUSA told any Lewbar representative that the termination would be stayed, and the September 13 letter stated precisely the opposite (Exhibit F, 9/13/07 Letter from M. Kelly to J. Martin), Lewbar could not justifiably have relied on any of MBUSA's alleged representations or actions contrary to the termination.  See Bishay v. Foreign Motors, Inc., 416 Mass. 1, 12 (1993) (where plaintiff was aware of concerns with its dealership application, it could not justifiably rely on manufacturer's actions).  Accordingly, Lewbar will not able to meet its burden of proving its claim for promissory estoppel and judgment should be entered for MBUSA.

## G.  Lewbar Cannot Meet Its Burden of Proving its Common Law Claim for Negligent Misrepresentation (Count VI)

A similar analysis applies to Lewbar's common law claim for negligent misrepresentation.  To prevail on its negligent misrepresentation claim under Massachusetts law,

---

[9] Even if Lewbar could prove its promissory estoppel claim, it would not be entitled to compensation for the alleged lost sale of the business.  Shelley v. Trafalgar House Pub., 977 F. Supp. 95, 98 n.7 (D.P.R. 1997) ("Promissory estoppel permits only reliance damages and other courts have refused to extend the remedy to include expectation damages.") (citing Goodstein Constr. Corp. v. City of New York, 604 N.E.2d 1356, 1362 (N.Y. App. 1992) (holding that breach of agreement to negotiate in good faith did not entitle plaintiff to lost profits because a party should not get the benefit of a bargain not reached)).  Lewbar's reliance damages would be limited to its costs associated with negotiating with potential buyers between August 28, 2007, when its dealership was terminated without conditions, and September 20, 2007, when MBUSA explicitly confirmed that the dealership had effectively been terminated.

Lewbar must show that MBUSA "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458-459 (Mass. 2002) (summary judgment granted where plaintiff could not establish inducement to act or forbearance) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982) (internal cites omitted)).

Lewbar alleges that, prior to MBUSA's termination of the Dealer Agreements, its representatives made material misrepresentations that were designed to induce Lewbar to continue negotiating in good faith with Gengras.  (Am. Compl. ¶ 36.)  Pollack claims that MBUSA representatives also told her on several occasions before the July 31, 2007 termination notice that MBUSA would allow her to sell the dealership.  (Pollack Dep. at 157-59.)  She cannot recall any such representations that were made after the first notice of termination was issued on July 31, 2007.  (Id. at 150-51, 158-59.)

MBUSA, of course, encouraged the sale of Lewbar's dealership or the acquisition of a partner to provide a capital infusion.  (Piekarski Aff. ¶ 5.)  Circumstances dramatically changed, however, when Lewbar closed the dealership without notice on August 27, 2007, which MBUSA considered detrimental to both Lewbar and MBUSA's businesses and the Mercedes-Benz brand in the market, and inconvenienced existing and potential customers.  (See Exhibit G, 9/27/07 Letter from M. Kelly to J. Martin.)  MBUSA issued the August 28, 2007 notice of termination in direct response to Lewbar's sudden closing.  (Exhibit E.)  There is simply no evidence to support Lewbar's claim that any representations MBUSA made that it could sell the dealership that were made before August 27, 2007 were both false when made and made with "knowledge of [their] falsity."  Furthermore – as Pollack admits –  there is no evidence of any kind that, after the

-19-

dealership closed on August 27, 2007, anyone at MBUSA ever told Pollack that she could sell the business to Gengras and the termination notice would be stayed or eliminated.  (Pollack Dep. at 150-51, 158-59.)  In fact, MBUSA specifically rejected this contention in its September 13 letter to Lewbar's counsel in response to its receipt of Gengras's Letter of Intent.  (See Exhibit F, 9/13/07 Letter from M. Kelly to J. Martin.)

Similar to the promissory estoppel analysis in Part F, above, Lewbar could not reasonably have relied on or after August 28 on any representation that MBUSA made before the dealership closed, because the closing was a material breach of the Dealer Agreements that fundamentally changed the parties' relationship.  Moreover, Lewbar will not be able to show any pecuniary loss or other detriment it suffered as a result of continuing to negotiate with Gengras after MBUSA noticed the termination of the Dealer Application.  (Am. Compl. ¶¶ 36-37.)  Once the notices of termination were issued, effecting a legal franchise termination under the Dealer Agreements and Massachusetts law, Lewbar simply had nothing to sell.  As a result, judgment should be entered for MBUSA.

## **CONCLUSION**

For the reasons set forth above, MBUSA requests that the Court grant its motion for summary judgment, enter judgment in its favor on all claims and grant MBUSA such other relief as is just and fair.

DEFENDANT MERCEDES-BENZ, USA, LLC

By its attorneys,


 _/s/ Erica Tennyson_____
Erica Tennyson (BBO# 660707)
DAY PITNEY LLP
One International Place
Boston, Massachusetts 02110
(617) 345-4600
etennyson@daypitney.com

*Admitted pro hac vice:*
Steven M. Greenspan (ct00380)
DAY PITNEY LLP
242 Trumbull Street
Hartford, Connecticut 06103-1212
(860) 275-0100
January 20, 2009                  smgreenspan@daypitney.com


## CERTIFICATE OF SERVICE

I, Erica Tennyson, hereby certify that this document, Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 20, 2009.


 _/s/ Erica Tennyson_____
Erica Tennyson